Filed 3/21/25  P. v. Meza CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B335096 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA029459) |
| v. | |
| ROBERT ANTHONY MEZA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Joy Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1991, a jury convicted appellant Robert Anthony Meza of second degree murder. Although the court did not instruct the jury on felony murder, the natural and probable consequences doctrine, or any theory in which malice could have been imputed to Meza, thirty years later, Meza filed a petition for resentencing under Penal Code section 1172.96.[1] After an evidentiary hearing, the superior court denied Meza's petition, finding him ineligible for relief as a matter of law and, alternatively, guilty of second degree murder beyond a reasonable doubt.

On appeal, Meza contends he is not ineligible for relief as a matter of law because a section 1172.6 petition permits him to challenge a conviction for implied malice murder even when malice was not imputed to him. He also argues the court erred because: (1) it failed to act as an independent factfinder; (2) it used an incorrect standard of proof to deny his petition; (3) substantial evidence would not support a finding that he was guilty of murder beyond a reasonable doubt; (4) the court did not sufficiently consider Meza's youth at the time of the crime; and (5) "cumulative error" warrants reversal. We hold Meza has failed to demonstrate error and therefore affirm.

---

[1] Undesignated statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered as 1172.6 without substantive change. (*People v. Strong* (2022) 13 Cal.5th 698, 708, fn. 2.) For clarity, we use the current statutory numbering.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## A. *Meza Is Convicted of Second Degree Murder*

### 1. Information

In 1991, an information charged that Meza "did willfully, unlawfully, and with malice aforethought[,] murder ARCENIO BELTRAN." The information also charged Meza with the attempted murders of Jose Navar and Moises Rodriguez.

### 2. Testimony

A jury trial began in October 1991. Rodriguez testified that, on the night of the incident, he and his nephews—Navar and Beltran—stopped by a "lunch truck" to get some food.[3] Meza and a companion had arrived before Rodriguez and his nephews, and Meza was ordering food. After Meza finished, and Rodriguez began placing his order, Rodriguez noticed that "something happened," and Meza and his companion began chasing Rodriguez's nephews.

Navar testified that, as Rodriguez was ordering, Meza's companion asked Beltran where he was from.[4] Beltran

---

[2] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

[3] Navar testified that the time was a little after midnight.

[4] A gang expert later explained that "where are you from" was a "question that one gang member asks another to determine his gang affiliation."

3

answered, "Rookstown." Meza responded, "Fuck Rookstown" and "Stoners Trece" and punched Beltran in the face.[5]

Rodriguez testified he saw Beltran lying in the street, "already knocked out," but Meza "kept on hitting him, jumping on his face, stomach and hands." He also saw Meza's companion "beating up" Navar. Rodriguez ran toward where Meza was attacking Beltran, shouting at Meza to leave Beltran alone; Meza continued beating Beltran. When Rodriguez was approximately 15 feet away from the two, Meza drew a gun, declared that they were in his gang's territory, threatened to shoot Rodriguez if he got closer, and fired a shot into the air. Rodriguez ran, joined by Navar, who had been able to escape Meza's companion; Meza fired "three or four shots" at the pair. After the shooting stopped, Rodriguez returned, worried about Beltran, who was still lying in the street, unconscious. Meza and his companion were across the street, having walked away from the scene. But when Rodriguez tried to step onto the street to approach his nephew, Meza fired one more shot at Rodriguez, causing him to flee again. Soon after, a car ran over Beltran, killing him. The lunch trunk proprietor testified that, right before the car struck Beltran, the proprietor saw Beltran "bend his neck forward" as if trying to lift his head up.

When a police officer later asked the lunch truck proprietor to describe where Beltran was, the lunch truck proprietor pointed to an area between two double yellow lines in the middle of the street, which the officer described as a "turn bay," or a lane from which turns could be made. However, the sheriff's deputy

---

[5] The same gang expert also testified that the area in which the incident occurred was the territory of the Stoners Trece gang, who did not "get along" with the Rookstown gang.

4

responding to the scene testified that Beltran "was lying on his back near the curb, the south curb of Olympic Boulevard. His head was near the curb. His head was to the south. His feet were to the north." The deputy later described a picture shown to him as "the scene as it appeared that night. The victim lying next to the curb."

The lunch truck proprietor guessed that, around the time the incident occurred, there were typically one to two cars per minute driving down the road that Beltran was lying on. Rodriguez testified that when he drove down the street where the lunch truck was, there were "one or two cars." Navar also testified that there were cars driving on that street. The responding sheriff's deputy, who arrived at 2:45 a.m., testified there were cars driving "up and down the street" as he investigated the crime scene; he estimated there was "less than one [car] a minute."

### 3. Closing Arguments

After the People rested, the court granted a defense motion to dismiss a first degree murder charge—citing insufficient evidence to show premeditation and deliberation—but denied the motion as to second degree murder, finding "more than ample evidence to support a conviction of second degree murder."

In his closing argument, the prosecutor argued that the People had proven the element of implied malice because Meza beat and kicked Beltran until he was unconscious, left him lying on a "four lane highway" at night when it would be "much more difficult to see" someone lying in the street, and then prevented Rodriguez from helping him. The prosecutor argued the same facts would support a finding that Meza had an intent to kill Beltran, which constituted express malice.

5

In his closing argument, defense counsel contended Beltran was left in a turn bay, not a traffic lane, which was a "portion of the street where cars don't go." Counsel also argued that if Meza had wanted to kill Beltran, he would have shot him.

### 4.    Jury Instructions

The court instructed the jury with two definitions of second degree murder: (1) "the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation"; and (2) "the unlawful killing of a human being when:  One, the killing resulted from an intentional act.  Two, the natural consequences of the act are dangerous to human life.  And, three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life."[6]

The court did not instruct the jury on felony murder, on the natural and probable consequences doctrine, or on any theory in which malice was imputed to Meza solely based on aiding and abetting a crime.[7]

---

[6] Based on a jury question, an additional instruction on second degree murder was given in which the third element was articulated as "the act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."

[7] While the implied malice instruction incorporated an idea of natural and probable consequences, that is separate from the natural and probable consequences doctrine at issue here.  (See, e.g., *People v. Rivera* (2021) 62 Cal.App.5th 217, 231, fn. omitted ["Before Senate Bill No. 1437, 'the natural and probable consequences doctrine was an exception to the actual malice

*(Fn. is continued on the next page.)*

6

## 5. Conviction and Appeal

The jury found Meza guilty of second degree murder (and found true that Meza personally used a firearm during the murder), assault, and the grossly negligent discharge of a firearm. The court sentenced Meza to 15 years to life—with an additional 4 years for a firearm enhancement—on the second degree murder conviction, 3 years for assault (to run concurrently), and 2 years for the grossly negligent discharge of a firearm, which sentence was stayed under section 654. Meza appealed and we affirmed. (*People v. Meza* (Apr. 26, 1993, B063864) [nonpub. opn.] (*Meza I*).) In response to "defendant's contention that the evidence was insufficient to show malice," we disagreed, finding "the evidence sufficient to justify a finding of implied malice" because "Defendant not only beat the victim senseless and left him helpless on a public street, but used a firearm to insure no one would intercede to help the victim." We expressly found that such an action "amply demonstrated a conscious disregard for human life." We also found that "the evidence would have supported express malice by a finding that

_____

requirement'—i.e., the requirement of either express or implied malice. [Citations.] The name of the doctrine is confusing, since implied malice also incorporates the idea of 'natural and probable consequences,' but the two concepts are distinct. Whereas implied malice is based on 'the "natural and probable consequences" of a defendant's *own* act' the natural and probable consequences doctrine was 'a theory of vicarious liability under which "[a]n aider and abettor [was] guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commit[ted] (the nontarget crime)" '—including murder—' "that [was] a natural and probable consequence of the target crime" ' "].)

7

defendant, by leaving the victim in such a precarious position, intended the death."

## B.    *Meza Petitions for Resentencing*

### 1.    Petition

In December 2021, Meza filed a section 1172.6 petition for resentencing, contending that he "was convicted of Second-Degree murder and attempted murder with true findings on related firearm allegations."  In an accompanying declaration, Meza averred that "[a] complaint, information, or indictment was filed against me that allowed the prosecution to proceed under a theory of First-Degree Felony Murder under the Natural and Probable Consequences Doctrine"; that he "was charged with first degree felony murder" and "[h]ad I went to trial there was a possibility that I could be convicted of First-Degree Felony Murder under the Natural and Probable Consequences Doctrine. (Accomplice Liability)"; and that he "could not now be convicted of First-Degree murder because of changes made to Penal Code § § 188 and 189."  He also declared that he was not the "actual perpetrator"; that he did not, "with the intent to kill," aid the "actual shooter in[] the commission of attempted murder"; that he was "not a major participant in the felony"; that he did not "act with reckless indifference to human life"; and that a court or jury had already determined he was not a major participant and did not act with reckless indifference to human life.  He requested the court appoint counsel for him, and the court obliged.

### 2.    Opposition

In July 2022, the People opposed Meza's petition, arguing that "the jury [in Meza's trial] was not instructed on felony

8

murder, natural and probable consequences or any other theory of culpability that imputed malice to Petitioner," and "was not even instructed on aiding and abetting." The People asserted that Meza was "prosecuted as the actual perpetrator who committed this crime with actual malice" and therefore was ineligible for relief. Attached to the People's opposition were our 1993 opinion affirming the judgment and the jury instructions from Meza's trial.

The attached instructions informed the jury that, to convict Meza of murder, it was required to find that a human being was unlawfully killed "with malice aforethought." Malice was defined as "either express or implied." The jury was instructed that "Malice is express when there is manifested an intention unlawfully to kill a human being" and that "Malice is implied when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

The instructions also contained two definitions of second degree murder: (1) "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation"; and (2) "Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

9

### 3. Reply

In his reply, Meza argued that there was evidence that a "companion" was present at the scene of the crime, and with conflicting testimony about the actions taken by Meza and by his companion, it would be "improper" for the court to engage in fact-finding at the prima facie stage. Meza additionally argued that, while no felony murder instruction was given at his trial, "the argument of the prosecutor was the functional equivalent." Meza concluded that, "[i]n essence, in their closing argument, the prosecution asked the jury to impute malice onto Mr. Meza based purely on his participation in the underlying felonies of assault on Mr. Beltran, assault with a deadly weapon on Mr. Navar, and negligent discharge of a firearm on Mr. Rodriguez."

### 4. Ruling

In its April 2023 ruling, the court noted that the jury "was not instructed on a theory of felony murder or on a theory of natural and probable consequences, or as an aider and abettor" but had "convicted the defendant of second degree murder, assault by means of force likely to produce great bodily injury, and grossly negligent discharge of a firearm." However, referencing Meza's contention that "based upon the prosecutor's argument to the jury, it was unclear whether or not he had imputed the defendant's malice based on his conduct prior to the death of the victim, complicated by the fact that there had been a third co-defendant present at the scene but who was never apprehended," the court found it could not "come to an accurate decision without an evidentiary hearing" and ordered counsel to confer with the court clerk to set a date for such a hearing. In May 2023, the People filed a motion to reconsider, arguing that relief was available only to those convicted "based on vicarious

10

liability." Meza opposed the motion, arguing the People had raised "no new legal issues." The court denied the motion without articulating its reasoning.

### C. *The Court Denies Meza's Petition*

In August 2023, Meza filed a brief arguing he was entitled to relief because he "was not the actual killer, he did not directly aid and abet the actual killer, and he was not a major participant who acted with reckless indifference to human life." He argued that his assault was not the "legal cause" of Beltran's death, but that "the death was the unforeseeable result of a superseding cause that exculpates him, namely the reckless conduct of a hit and run driver." He added that there was insufficient evidence to prove express malice, and the court was not permitted to infer malice based on the fact that he fired his gun at Rodriguez or Navar. He also contended there was insufficient evidence to prove implied malice because his actions did not have an objectively high probability of death, and no evidence demonstrated a subjective awareness of the risk of death. Finally, Meza urged the court to consider that he was 20 years old at the time of the incident, and that recent research had demonstrated "a 20-year-old is much less able than an adult to think through the consequences and recognize (and consciously disregard) how his conduct might ultimately be dangerous to life." Therefore, "[b]ased on Mr. Meza's youthfulness and immaturity, in conjunction with how quickly this incident escalated, it cannot be shown beyond a reasonable doubt that he acted with a specific intent to kill nor that he acted with a conscious disregard of the danger to human life."

At the October 2023 evidentiary hearing, the parties presented no new evidence or testimony. Instead, both counsel

11

argued their position.  The court took the matter under submission.

In November 2023, the court denied Meza's petition, finding him ineligible for relief.  The court set forth the facts it had "[t]aken from the court reporters' transcript:"

"The petitioner, along with another[,] confronted the victim, his uncle and another of the uncle's nephews, with a 'where you from' challenge.  When the victim answered with the name of a gang that was rival of the petitioner[']s, the petitioner hit the victim in the face.  Petitioner then pulled a gun from his pocket and along with the other person chased the victim and the other young man and beat and kicked him.  The victim (Arsenio [Beltran]) ended up lying senseless in the street.  When the uncle attempted to come to the aid of Arsenio, the petitioner fired into the air.  The other young man (Jose [Navar]) ran away, hearing shots, one of which went by his head.  A witness said the petitioner fired towards the uncle and Jose.  (The jury acquitted petitioner of attempted murder for the shootings[.])  As petitioner and the other individual fled the scene, a car ran over Arsenio, killing him.  A witness testified that Arsenio may have been trying to get up when he was struck."

The court noted that "[t]he jury was not instructed under either the felony murder or natural and probable consequences doctrines."  The court also recounted that Meza had asked it to consider his "youth . . . in considering whether he could appreciate what the consequences of his actions could be" and "the facts that the street was well lit, lightly traveled and decedent was in a turn bay."  The court stated it had considered these factors, and found "a 20-year-old would recognize the risks of the actions he took in this matter."  It concluded the People

12

"have proven beyond a reasonable doubt, that the petitioner could be convicted of second-degree implied malice murder under current law."

In response to Meza's argument that the court could not find implied malice because "he 'did not commit any act the natural and probable consequences of which involved a high degree of death, and he did not consciously disregard that high risk of death,' " the superior court noted that "[a]n 1172.6 Petition is not a retrial," and quoted from our affirmance of Meza's conviction:

"The victim was beaten senseless and left dying on [a] public throughfare at night with a traffic rate of approximately one car per minute. No one to whom the question was put could conclude other than that it was likely the victim would be run over sooner or later, nor would anyone hearing of such an incident be surprised. Drunk drivers, reckless drivers, inattentive drivers, hit and run drivers, half-blinded drivers, incompetent drivers, unlicensed drivers, aggressive drivers, drivers fleeing from the police, drivers racing with each other, are all hazards with which motorists in Los Angeles must contend. [¶] A law-abiding driver was likely to hit someone lying in the middle of the street. Add to the mix one of the other kinds of drivers, and the chances go up significantly. While not quite as certain to cause death as tying someone to the railroad tracks (where a train might come along only every several hours) leaving someone helpless in the middle of the roadway where a car will come along sooner or later creates such a likelihood of death, that foreseeability, as opposed to inevitability, is a foregone conclusion. [¶] Similarly, defendant here placed the victim in a dangerous situation and the resulting death was a

13

foreseeable and direct consequence.  The evidence established causation."

The superior court therefore found Meza ineligible for relief and denied his petition.  Meza timely appealed.

## DISCUSSION

### A. *The Superior Court Correctly Found Meza Ineligible for Relief as a Matter of Law*

Effective January 1, 2019, the law changed as to the "felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Sen. Bill No. 1437 (2017–2018 Reg. Sess.); Stats. 2018, ch. 1015, § 1, subd. (f).)  As amended, the law provides that except for first degree felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3); *People v. Eynon* (2021) 68 Cal.App.5th 967, 974.)  In other words, "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea."  (Stats. 2018, ch. 1015, § 1, subd. (g).)

Thus, to be eligible for relief under section 1172.6, a petitioner must be a "person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime."  (§ 1172.6, subd. (a).)  A petitioner who was not convicted of felony murder,

14

murder under the natural and probable consequences doctrine, or any other theory under which malice was imputed to the person based solely on that person's participation in a crime is ineligible for relief under section 1172.6.

Here, the court initially stated it could not determine Meza's eligibility for relief without an evidentiary hearing. Neither party introduced any new evidence at the evidentiary hearing. The court found Meza ineligible for relief, citing the fact that the jury did not receive instructions on felony murder, the natural and probable consequences doctrine, or a theory of aiding and abetting. We review de novo the legal question of whether Meza is ineligible for relief as a matter of law. (*People v. Bodely* (2023) 95 Cal.App.5th 1193, 1200.)

Meza does not dispute that he was not convicted of felony murder, murder under the natural and probable consequences doctrine, or any other theory in which malice was imputed to him. He argues that he is nevertheless eligible for relief under section 1172.6 because, in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), our Supreme Court "held that an improper finding of implied malice comes within the ambit of SB 1437, because the relevant statute was amended to require malice." *Reyes* is inapposite.

In *Reyes*, a fellow gang member showed the defendant that he was carrying a revolver. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) The defendant, the armed gang member, and several other gang members then rode their bicycles "to an area on the edge of territory belonging to a rival gang." (*Ibid.*) Once there, the armed gang member shot someone driving by in a car. (*Ibid.*) The defendant was charged with murder. (*Ibid.*) "The prosecutor's principal arguments at trial were that [defendant]

15

Reyes had intended to aid either an assault or disturbing the peace, or that he had conspired to commit one of those offenses. Under the then–applicable natural and probable consequences theory, Reyes could be found guilty of second degree murder if the jury determined that he aided and abetted one of those target crimes and that murder was a natural and probable consequence of the offense." (*Id.* at p. 984.) Reyes was convicted of second degree murder. (*Ibid.*)

After the defendant petitioned for relief under section 1172.6, the superior court denied the petition after an evidentiary hearing, finding him guilty of second degree murder beyond a reasonable doubt. (*Reyes*, *supra*, 14 Cal.5th at p. 987.) Because it was unclear whether the superior court "upheld Reyes's murder conviction on the theory that he was a direct perpetrator who harbored implied malice" or "on the theory that he directly aided and abetted implied malice murder," our high court addressed both theories. (*Ibid.*)

In addressing the first theory, our Supreme Court stated: "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Citing *People v. Knoller* (2007) 41 Cal.4th 139, 152, our high court added that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes*, at p. 989.)

16

The defendant in *Reyes* was eligible for relief under section 1172.6 because he could have been convicted for murder under the natural and probable consequences doctrine. Thus, at the evidentiary hearing, the superior court determined whether he was guilty of murder beyond a reasonable doubt. Here, by contrast, Meza could not have been convicted under the natural and probable consequences doctrine for the simple reason that the jury received no instructions on that doctrine. Nor did the jury receive any instructions on any theories of murder now made infirm "because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) Indeed, *Reyes*'s citation of the 2007 case of *People v. Knoller* to support its statement of law indicates that this element of implied malice murder was unaffected by the later enactment of SB 1437. (See also *People v. Clements* (2022) 75 Cal.App.5th 276, 298 [while "Senate Bill 1437 amended section 188 . . . [and] abolished the natural and probable consequences doctrine, it maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged"].) *Reyes* did nothing to expand the scope of a section 1172.6 hearing. (*Reyes*, *supra*, 14 Cal.5th at pp. 987–988 ["Nor do we have occasion, given the parties' contentions and the procedural posture of this matter, to consider the overall scope of section 1172.6 resentencing proceedings"].) Meza is therefore ineligible for relief under section 1172.6.

**B.** ***Alternatively, the Superior Court Properly Found Meza Guilty Beyond a Reasonable Doubt***

After finding Meza ineligible for relief, the superior court addressed his contentions that: (1) he did not commit an act whose natural and probable consequence involved a high

17

probability of death, given that the street was well lit and lightly traveled, and Beltran was in a turn bay; and (2) Meza's youth at the time of the murder rendered him incapable of appreciating the consequences of his actions and consciously disregarding a high risk of death.  In response to the first contention, the court quoted our previous reasoning addressing Meza's argument that his actions did not proximately cause Beltran's death.  In response to the second contention, the court found that "a 20-year-old would recognize the risks of the actions he took in this matter."

Meza contends the superior court erred because: (1) it failed to act as an independent factfinder; (2) it used the wrong standard to find Meza guilty of murder; (3) substantial evidence does not support a finding that Meza was guilty of murder beyond a reasonable doubt; (4) the court insufficiently considered Meza's youth; and (5) "cumulative error" warrants reversal.  We address each contention in turn.

### 1.    The Court Acted as an Independent Factfinder

Meza contends the court did not act as an independent factfinder because it stated the petition was not a retrial and then quoted our opinion in *Meza I*.  We discern no error from either action.

As Meza himself admits, in deciding a section 1172.6 petition, "the trial judge isn't charged with holding a whole new trial on all the elements of murder.  Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder."  (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298.)  As explained above, the "amendments to the substantive definition of murder" did not change the

definition of implied malice.  (*Ibid.*; see also *People v. Knoller*, *supra*, 41 Cal.4th at p. 152 ["malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' " or "when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" ' "].) Thus, the court correctly understood the scope of a section 1172.6 hearing.

Additionally, while superior courts may be prohibited from relying on the factual summaries contained in prior appellate decisions (see *People v. Clements*, *supra*, 75 Cal.App.5th at p. 292), Meza cites no similar bar to a superior court's consideration and adoption of the legal reasoning contained in such decisions. There is no reason the superior court should be required to paraphrase our legal analysis.[8]

---

[8] Meza also complains that the court's statement "Petitioner disputes that implied malice applies because he 'did not commit any act the natural and probable consequences of which involved a high degree of death, and he did not consciously disregard that high risk of death' " "makes no sense." Specifically, Meza claims "[i]t is unclear what the trial court means when it states that 'petitioner disputes that implied malice applies,' or when it references 'a high degree of death.' "

The quotation marks in the court's order makes clear that the court was addressing a contention *Meza made* in his August 2023 brief, which contained a section headed: "Malice cannot be implied because Mr. Meza did not commit any act the natural and probable consequences of which involved a high degree of

*(Fn. is continued on the next page.)*

19

Meza has failed to demonstrate the court did not act as an independent factfinder.

## 2.     The Court Used the Correct Standard

The parties agree that, at an evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)  Meza contends the court failed to meet this standard because it found that "[t]he people have proven beyond a reasonable doubt, that the petitioner *could be convicted* of second-degree implied malice murder under current law." (Italics added.)  We disagree.

While the superior court could have more precisely phrased its conclusion, the record adequately demonstrates that it employed the proper standard in finding Meza guilty of murder beyond a reasonable doubt.  As the People point out on appeal, the parties correctly articulated the standard in their written briefing.  In the People's initial response to Meza's petition, it stated that, at the evidentiary hearing, the People were required "to prove beyond a reasonable doubt that the petitioner 'is guilty of murder or attempted murder' under current law."  Similarly,

_____

death, and he did not consciously disregard that high risk of death."  In this section, Meza argued that "[t]he evidence presented cannot suffice to sustain a finding that Meza action's objectively had a high probability of death nor that he was subjectively aware that the act posed a risk of death to Beltran."  In the section immediately following the sentence that confused Meza, the court addressed and rejected this argument.

20

in Meza's May 2023 reply to the People's initial response, he stated that, at the evidentiary hearing, "the People bear the burden of proving, beyond a reasonable doubt and using the evidentiary rules described in section 1172.6, that Mr. Meza is guilty of murder under current law." He repeated this statement in his August 2023 briefing.[9] There is no record that the superior court ever challenged these assertions. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

Moreover, the court explicitly stated that it had considered "the facts that the street was well lit, lightly traveled and decedent was in a turn bay," and that Meza was 20 years old when the incident occurred. This suggests that the superior court was aware of its role as a factfinder determining criminal culpability.

### 3. Substantial Evidence Supports the Finding of Guilt

Meza argues that "[h]is act of leaving the victim in the roadway did not involve a 'high degree of probability['] that it would result in death."

We addressed this issue in *Meza I*, stating that "[t]he victim was beaten senseless and left lying on a public thoroughfare at night with a traffic rate of approximately one car per minute. No one to whom the question was put could conclude

---

[9] We note that, at the evidentiary hearing, Meza's counsel informed the court that "Per the statute, the prosecution bears the burden of proving beyond a reasonable doubt that Mr. Meza *can still be convicted* of second degree murder." (Italics added.)

other than that it was likely the victim would be run over sooner or later, nor would anyone hearing of such an incident be surprised. . . .  [L]eaving someone helpless in the middle of any roadway where a car will come along sooner or later creates such a likelihood of death, that foreseeability, as opposed to inevitability, is a foregone conclusion."  (*Meza I*, *supra*, B063864.)  When Meza's actions created "such a likelihood of death" that its foreseeability was "a foregone conclusion," his actions involved a high degree of probability that they would result in death.  We see no reason to paraphrase our original reasoning, with which we still agree.

### 4. The Court Sufficiently Considered Meza's Youth

The superior court concluded that "a 20-year-old would recognize the risks of the actions he took in this matter."  Meza argues that this gives "short shrift to consideration of appellant's youth at the time of the crime," and that the superior court's consideration was "not sufficient[]."  He quotes studies regarding adolescent brain development that discuss the probabilities and likelihood someone of Meza's age would appreciate the consequences of his actions.  Meza further argues because his "actions were highly impulsive, involving a fight that broke out when some young people met at a taco truck" and that "[t]here was no planning or sophistication in the manner in which appellant behaved," the court could not find that he behaved in a manner amounting to implied malice.

We reject these arguments.  The fight that "broke out" began when Meza's companion asked Beltran and Navar about their gang affiliation.  When Beltran named a rival gang, Meza derided it, shouted the name of his own gang, and then punched

Beltran. There is no evidence that Beltran fought back—instead the evidence showed that Meza continued beating Beltran while the latter was lying unconscious on the street. When Rodriguez tried to come to Beltran's aid, Meza was deliberate enough to draw a firearm, deliver a warning not to come closer, and fire a warning shot into the air. Finally, after Meza and his companion had walked away from Beltran, and Rodriguez tried again to help him, Meza fired another shot at Rodriguez, to keep him away from Beltran.

Thus, even were Meza's initial striking of Beltran borne of impulse, every subsequent action Meza took shows planning and sophistication in achieving his goal of preventing Rodriguez from helping his nephew; these actions could not necessarily be only considered "impulsive" due to youth. Substantial evidence thus supports the court's finding that Meza was not too young to appreciate the consequences of his actions.

### 5.     There Is No Cumulative Error

Because we hold that Meza failed to demonstrate any error, his argument of "cumulative error" also fails.

### DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

23